IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 14-4039-CR-C-BCW |
| ) | |
| WILLIAM HAYWARD COUNCIL, ) | |
| ) | |
| Defendant. ) | |

## REPORT AND RECOMMENDATION

Defendant William Council has filed a motion for suppression of evidence and for hearing on November 3, 2014. (Doc. 21). Defendant contends that all evidence yielded from the search and seizure on or about August 23, 2013, of the defendant and the residence at 9349 Chippawa Trail, Callaway Estates, Missouri, is the fruit of unconstitutional search and seizure and should be suppressed. (Doc. 21 at 1). The government has filed suggestions in opposition (doc. 26), asserting that no constitutional violation occurred. Defendant filed reply suggestions in support of his motion to suppress (doc. 30), and a hearing was held regarding the motion on December 1, 2014.[1]

## I. Background

On July 30, 2014, the Grand Jury returned a two-count indictment charging defendant Council in Count One with Felon in Possession of a Firearm in violation of 18 U.S.C. § 922(g)(1) and in Count Two with Possession of Unregistered Firearm in violation of 26 U.S.C § 5861(d). (Doc. 1). Specifically in Count Two, the Indictment alleges that "on or about August 23, 2013, in Callaway County . . . [defendant Council] knowingly received and possessed a firearm, a New England model, 12 gauge shotgun, serial number 312410, having a barrel of less than 18 inches in length, not registered to him in the National Firearms Registration and Transfer Record, in violation of Title 26, United States Code, Sections 5841, 5861(d), and 5871." (Doc. 1 at 2).

---

[1] This case was referred to the undersigned United States Magistrate Judge for processing in accord with the Magistrate Act, 28 U.S.C. § 636, and L.R. 72.1.

The alleged unlawful search and seizure here stems from an investigation following a report made to the Callaway County Sherriff's Department of an assault with a firearm on August 23, 2013.  As relayed through dispatch to Sergeant Kevin Foley of Callaway County at approximately 5:15 p.m., Andrew Wright reported that a man had aimed a weapon at him. Wright reported that he was standing in front of the residence of a friend, Melanie Miller, around 8:30 or 9:00 a.m. earlier that morning when he observed a man in a beat up, multi-colored, pickup truck drive by the house slowly, stare at him, shrug his shoulders, and continue to drive away slowly.  Later that day, according to Wright, he and Miller were driving toward Williamsburg when the same truck pulled in front of their vehicle, blocking most of the road. Wright reported that the man jumped out of the passenger side of the truck and knelt down pointing what appeared to be a sawed-off shot gun with black tape at him.  Wright further reported that he ducked down to avoid being shot and continued to drive around the man.  The man purportedly got back into the truck and followed Wright and Miller.  Wright was able to distance his vehicle from the man, and the man then abandoned the pursuit.

Sgt. Foley then contacted Melanie Miller, who confirmed Wright's account of the incident and identified the man as the defendant in this case, William (or "Bill") Council.  Miller stated that she and the defendant were friends, but that the defendant desired a more intimate relationship.  Miller also described the weapon carried by the man as dark in color with tape wrapped around the stock, and stated that she had observed him in possession of the weapon before.  Sgt. Foley testified that the Sheriff's Department was familiar with the defendant and knew that he resided at Callaway Estates.  Sgt. Foley testified that criminal complaints against the defendant had been filed by other residents of Callaway Estates, including allegations of violent behavior.

At this point, Sgt. Foley decided to make contact with the defendant at his residence and requested that Deputy Kirk Blehm go with him.  After briefing Dep. Blehm on the accounts of the incident, Sgt. Foley and Dep. Blehm arrived at 9349 Chippawa Trail, the address where the defendant was known to reside in Callaway Estates, at approximately 7:15 p.m. on August 23, 2013.  Upon arrival, the deputies observed a pickup similar to the one described by Wright and Miller and another pickup with a camper on its truck bed that was about twenty five to thirty yards distance from the road (See Gov. Ex. 1).  Sgt. Foley proceeded to the door of the camper.

2

while Dep. Blehm positioned himself off to one side and on the other side of a partition. In this position he had a view of the camper's doorway. (See Gov. Ex. 2).

Sgt. Foley knocked on the door to the camper. The camper moved as though someone was moving inside. The defendant responded from inside the camper, asking who was there. Sgt. Foley announced that the Sherriff's Office was present. When there was no response, Sgt. Foley knocked again. The defendant responded, again asking who was there, and Sgt. Foley loudly announced that the Sherriff's Office was present and instructed that he come to the door. The defendant opened the door of the camper, which opens outward, and stood in the doorway wearing only his underwear. Behind the defendant, a blanket was hanging inside the camper from the ceiling that obstructed the view into the camper. (See Dft. Ex. A). Dep. Blehm testified that from where he stood, he could see Sgt. Foley, the defendant standing at the doorway of the camper, and a blanket hanging behind where the defendant stood.

Sgt. Foley told the defendant that they needed to talk to him about a report received earlier that day. The defendant responded "okay", remaining in the doorway of the camper. Sgt. Foley recounted the incident as reported. Defendant responded that it was "fucking bullshit" and denied having done anything wrong. In response to Sgt. Foley asking where he was at 9:00 a.m. that morning, the defendant said that he had been asleep in his trailer. Defendant asked who had made the accusation, to which Sgt. Foley responded that Wright and Miller had reported the incident. Defendant called Miller a "liar" and stated that she was always causing problems for him. Defendant stated that the next time he saw her, he was going to "beat her half to death." Sgt. Foley then asked the defendant if he could search his camper for a shotgun. Defendant again denied having a shotgun inside the camper. Sgt. Foley said asked if he could take a look inside defendant's camper anyway and the defendant's response was—"Get a warrant."

Sgt. Foley testified that at this point, he intended to arrest the defendant for unlawful use of a weapon. Taking the defendant by the arm and pulling, Sgt. Foley ordered him to step outside the camper. Defendant resisted Sgt. Foley, and took a step back into the camper and stated "Wait a minute". Sgt. Foley testified that the blanket hanging in the camper's doorway blocked his view of the interior and he believed the defendant had access to a sawed-off shotgun. Sgt. Foley pulled the blanket down and the defendant retreated further inside the camper, trying to get loose. Dep. Blehm then stepped into the camper and grabbed the defendant's other arm

3

and the deputies pulled the defendant out of the camper and placed him in handcuffs at the base of the steps or just outside of the camper door.

Dep. Blehm testified that during the struggle to pull the defendant out of the camper, he appeared to be holding onto a table. Dep. Blehm further testified that he stood up after the defendant was handcuffed, looked into the camper which he could now see because the blanket was torn down and observed what looked to him to be a handle of a shotgun with black tape in the loft sleeping area of the camper. Together the deputies escorted the defendant to Sgt. Foley's patrol car. The defendant, who was still dressed only in his underwear, asked the deputies if he could get some clothes from inside his camper. Dep. Blehm informed the defendant that he could not go back inside his camper, but stated that he would be willing to get him a pair of pants and boots. Dep. Blehm testified that the defendant stated that he wanted Dep. Blehm to get him some clothes. Dep. Blehm then went back inside the camper, retrieved a pair of pants and boots, and while inside, he clearly observed a firearm by the bed and next to a laundry hamper. (See Gov. Ex. 3 & 5).

Dep. Blehm reported what he had seen to Sgt. Foley, who then instructed Dep. Blehm to remain there at the scene while he obtained a search warrant for the camper. (See Gov. Ex. 8). A New England brand sawed-off shot gun with black electrical tape on the barrel loaded with one live round was eventually recovered from the location as described by Dep. Blehm upon execution of a search warrant for the defendant's camper at 9:30 p.m. later that day. (See Gov. Ex. 4).

Defendant contends he was unlawfully seized when the deputies removed him from his camper and further asserts that Dep. Blehm's observation of a firearm in the defendant's camper stemmed from his unlawful presence inside the camper without a warrant. Defendant asserts that the subsequent search warrant was also invalid as it was only supported by information gained by the deputies' illegal entry into the camper. In his motion, defendant requests "the Court for an Order suppressing: all physical evidence, whether tangible or intangible; any statements or admissions of Defendant; any and all observations of law enforcement officers and any other tangible or intangible evidence obtained uring, or directly or indirectly derived from, the searches in his person and/or the premises commonly known as 9349 Chippawa Trail, located in Callaway Estates, Callaway County, Missouri, and any outbuildings or other structures, vehicles

4

or other property located on or near that location, in which Defendant had a reasonable expectation of privacy on or about August 23, 2013." (Doc. 21 at 1).

The Government disagrees and asserts that the deputies were authorized to make contact with the defendant at his trailer after having received a report of the incident that occurred that day. The Government further asserts Defendant's arrest was based on probable cause that he had committed the felony of unlawful use of a weapon. The Government further contends that because of the small confines of the camper and the risk that the defendant had access to a weapon there were exigent circumstances present justifying a warrantless entry inside the camper. Finally, the Government contends once lawfully into the camper, Dep. Blehm observed the handle of a gun as described by witnesses to the earlier incident in plain view.

## II. Legal Analysis

### A. Warrantless Arrest

The Fourth Amendment protects people "against unreasonable searches and seizures." U.S. Const. Amend. IV. "Searches and seizures inside a home without a warrant are presumptively unreasonable." Brigham City v. Stuart, 547 U.S. 398, 403 (2004) (quoting Groh v. Ramirez, 540 U.S. 551, 559 (2004)). This stems from the Supreme Court's reasoning that "the Fourth Amendment has drawn a firm line at the entrance to the house." Payton v. New York, 445 U.S. 573, 590 (1980). The Supreme Court has further held that "the area immediately surrounding and associated with the home—what our cases call the curtilage—as part of the home itself for Fourth Amendment purposes." Florida v. Jardines, 133 S. Ct. 1409, 1414 (2013) (quotation omitted); see also United States v. Dunn, 480 U.S. 294, 301 (1987). Even so, because 'reasonableness' is fundamental to the Fourth Amendment, "the warrant requirement is subject to certain reasonable exceptions." Kentucky v. King, 131 S. Ct. 1849, 1856 (2011) (citing Brigham City, 547 U.S. at 403). One exception to the warrant requirement permits a law enforcement officer to enter a home if based on probable cause and exigent circumstances exist. Radloff v. City of Oelwein, 380 F.3d 344, 348 (8th Cir. 2004) (citing Anderson v. Creighton, 483 U.S. 635, 641 (1987)). For this exception to apply, "the burden is on the government to demonstrate exigent circumstances that overcome the presumption of unreasonableness that attaches to all warrantless home entries." Welsh v. Wis., 466 U.S. 740, 750 (1984) (citing Payton v. New York, 445 U.S. at 586).

5

### 1. Probable cause for the defendant's warrantless arrest

Probable cause "exists when at the moment of arrest police have knowledge of facts and circumstances grounded in reasonably trustworthy information sufficient to warrant a belief by a prudent person that an offense has been or is being committed by the person to be arrested." United States v. Oropesa, 316 F.3d 762, 769 (8th Cir. 2003) (quoting United States v. Hartje, 251 F.3d 771, 775 (8th Cir. 2001)). The probable cause inquiry is not evaluated from the perspective of an all-knowing observer, but from the perspective as would have been apparent to a reasonable person in the position of the arresting officer. United States v. Rivera, 370 F.3d 730, 733 (8th Cir. 2004).

When Sgt. Foley decided to arrest the defendant he knew the following facts: (1) Both Miller and Wright had given corroborative accounts of an incident where a man had blocked the road with a truck and aimed a sawed-off shotgun at them; (2) Miller had positively identified the defendant as the man involved in the incident, stated that she knew him personally and knew him to possess a similar sawed-off shotgun; (3) The truck parked at the defendant's property matched the description provided by Wright; (4) Sgt. Foley's personal observations during his encounter with the defendant at his residence included that the padlocks on the door to the camper were not locked; (5) After knocking and announcing the presence of law enforcement twice in response to defendant asking who was there, and despite seeing the camper move as though someone inside was moving, the defendant stalled before opening the door dressed only in his underwear; (6) When the defendant came to the doorway, a towel hung behind him blocking the officer's view into the camper; (7) In response to the officers explanation of the incident as reported, the defendant cursed, denied the accusations, and threatened to "beat [Miller] half to death"; and (8) The defendant denied there was a shotgun in the camper and told the officers to "Get a warrant" in response to their request to look inside for a shotgun.

The Court agrees with the Government that the above facts constitute probable cause for the arrest of defendant on the unlawful use of a weapon. The defendant's denial that he had done anything wrong and denial that he did not have a shotgun in the camper do not detract from this conclusion. It was reasonable from the officers' standpoint to find the defendant's behavior suspicious when the officers were investigating the reported incident, and to further believe the information provided by Miller and Wright was true. Under the totality of the circumstances, a

6

reasonably prudent person in Sgt. Foley's position would have concluded that the defendant had committed the offense of unlawful use of a weapon.

### 2. Entry into the defendant's residence and exigent circumstances

The Court also concludes deputies' entry onto the defendant's curtilage was lawful when they knocked on the door of the camper for the purpose of investigating the reported incident, and to ask consent to search the property for the shotgun described in the reported incident. United States v. Weston, 443 F.3d 661, 667 (8th Cir. 2006) (officers' entry into the curtilage in furtherance of a legitimate law enforcement objective was not unreasonable when they approached the front door to announce their presence, inquire about stolen vehicles, and request consent to search the remainder of the property); see United States v. Jones, 239 F.3d 716, 720 (5th Cir. 2001) (investigative tactic is not inherently unreasonable when officers knock on a residence seeking to gain an occupant's consent to search or when officers reasonably suspect criminal activity); see also United States v. Reed, 733 F.2d 492, 501 (8th Cir. 1984) ("No Fourth Amendment search occurs when police officers who enter private property restrict their movements to those areas generally made accessible to visitors-such as driveways, walkways, or similar passageways.").

The encounter between Sgt. Foley and the defendant became forcible when Sgt. Foley took hold of the defendant's arm and ordered him to step outside of the camper. The issue therefore then becomes whether the defendant's Fourth Amendment rights were violated—was the seizure unreasonable—when the deputies attempted to arrest the defendant at the doorway of his residence. The Government asserts that the law enforcement officers attempted to effect a proper arrest based on probable cause while the defendant was voluntarily in the public, and that once the defendant resisted the deputy's attempt to arrest him and retreated into his camper, there were exigent circumstances present justifying the officers' entry into the camper in pursuit of the defendant. Specifically, the Government contends that there was a legitimate concern that the defendant had immediate access to the sawed-off shotgun described in the incident reports. See United States v. Hill, 430 F.3d 939, 941 (8th Cir. 2005) ("A legitimate concern for officer safety or the safety of others may constitute an exigent circumstance, and a warrantless entry into a residence may be justified if an officer has a reasonable fear of harm."). The Government further contends that the entry was justified as a "hot pursuit" of a fleeing suspect.

7

In support of their position, the Government cites <u>Santana v. United States</u>, 427 U.S. 38 (1976) and <u>United States v. Schmidt</u>, 403 F.3d 1009 (8th Cir. 2005). In <u>Santana</u>, law enforcement officers directed a controlled buy of heroin that would lead to probable cause for the defendant's arrest for drug dealing out of her home. 427 U.S. at 40. When officers pulled up to Santana's residence, they saw her standing in the doorway of her house. <u>Id.</u> The officers announced themselves as law enforcement upon exiting their vehicles, at which point the defendant retreated inside the residence. <u>Id.</u> The officers followed her through the open doorway and stopped her just inside the entrance of the home. <u>Id.</u> The defendant tried to pull away from the officers, dropping packets of heroin to the ground. <u>Id.</u> The Court first concluded that based on these facts, the defendant was in a public place at the time when the officers arrived at the residence, which was at least in part, for the purpose of effecting her arrest. <u>Id.</u> at 42. The Court next considered whether the defendant's retreat into her house, a private space, could thwart the officer's otherwise lawful attempt to arrest her. <u>Id.</u> at 42-43. Ultimately, the Court found that it could not; the Court concluded that the officer's warrantless entry into the residence was justified by the exigency circumstance of "hot pursuit", which in this case meant that that there was a "realistic expectation that any delay would result in destruction of evidence". <u>Id.</u> at 43.

The Eighth Circuit in <u>Schmidt</u>, relying on <u>Santana</u>, determined that an officer's warrantless entry into the defendant's residence to effect an arrest based on probable cause was justified by the existence of the "hot pursuit" exigency. 403 F.3d at 1009. In <u>Schmidt</u>, the officer followed two cars that he had observed drive past him in excess of the speed limit. <u>Id.</u> at 1012. The cars stopped outside the defendant's residence and the officer made contact with the defendant, an eighteen year old, who had exited his vehicle and was standing in the yard outside his home exhibiting behavior to make the officer believe he had been drinking alcohol. <u>Id.</u> The officer determined to arrest the defendant for underage drinking. <u>Id.</u> As the officer reached for his handcuffs, the defendant kicked him in the knee and escaped into his house after the officer attempted to tackle him in the yard. <u>Id.</u> The officer proceeded to arrest the other individuals who had been with the defendant, at which point the defendant reemerged to his doorstep, yelling that the officer had no right to be on his property. <u>Id.</u> The officer approached the defendant, and the defendant retreated back inside and locked the door. <u>Id.</u> After knocking and

8

announcing his presence, and receiving no response, the officer kicked in the door and chased after the defendant inside the residence.  Id.

As in Santana and Schmidt, the defendant here was in a public place when he voluntarily opened the door of the camper and stood in the doorway.  Santana, 427 U.S. at 42 (the defendant was held to be in a public place where she was standing in the doorway of her home, knowingly exposed to the "public view, speech, hearing, and touch as if she had been standing completely outside her house."); Duncan v. Storie; 869 F.2d 1100, 1102 (8th Cir. 1989) ("The doorway of an individual's home or apartment or hotel room may be a public place for the purpose of making a warrantless arrest if the individual has come to stand in the doorway voluntarily"); but see Mitchell v. Shearrer, 729 F.3d 1070, 1075-76 (8th Cir. 2013) (the defendant was held not to be in a public place where police first tried to arrest him after he tried to close the interior door).  Both arresting deputies testified that the defendant was standing at the doorway or threshold of his camper.  Here, the Court does not find that the evidence supports a finding that the defendant came to be at his doorway as a result of either coercion or deceit on the part of the deputies.

Defendant asserts that Santana is distinguishable from this case in that the deputies had plenty of time "to obtain an arrest warrant for the Defendant even after making contact with him as another officer was present."  (Doc. 30 at 3).  However, Supreme Court precedent has established that the Fourth Amendment does not require officers to have a warrant before making a valid arrest upon a reasonable belief that the person to be arrested has committed a felony. United States v. Watson, 423 U.S. 411, 416-417 (1976) (requiring officers to have a warrant before making an arrest would be an "intolerable handicap" for law enforcement).  Moreover, "the relevant inquiry is not whether there was a warrant or whether there was time to get one, but whether there was probable cause for the arrest."  Id., at 417.

Having reached the conclusion that the deputies here had probable cause to believe the defendant committed a serious felony offense involving a firearm, the nature of which involved the defendant blocking the road and aiming a sawed-off shotgun at two travelers, the Court also concludes that the circumstances presented to the deputies during the encounter with the defendant at his residence supported a legitimate concern for their safety.  The deputies were also aware of prior allegations of violent behavior by the defendant made by other residents of Callaway Estates.  When the deputies knocked on the door of the camper they could see the camper moving indicating someone was inside.  They announced their presence twice in

9

response to the defendant asking who was there.  There was a delay before the defendant came to the door.  When the defendant opened the door there was a blanket hanging behind him that obstructed the deputies' view of the camper's interior, which was a very confined space.[2]  (See Gov. Ex. 1 & 5).  The defendant was uncooperative, appeared angry, and made a threat toward another person.  After Sgt. Foley took hold of the defendant's arm and ordered him out of his camper, he retreated inside where the officers could not see because the blanket stating "Wait a minute".  Clearly, a reasonable officer having the personal observations and information known by Sgt. Foley would fear for his safety based on a belief that the defendant had access to the sawed-off shotgun described in the reports of the earlier incident.  See United States v. Ball, 90 F.3d 260, 263 (8th Cir. 1996) (exigent circumstances include if lives are threatened); United States v. Hill, 430 F.3d 939, 941 (8th Cir. 2005) (warrantless entry into a residence may be justified upon an officer's reasonable fear of harm).

Whether the exigent circumstance of 'hot pursuit' were present in this case is a more difficult question.  In considering the doctrine of 'hot pursuit', two factors are involved in accordance with the Supreme Court's decision in Welsh v. Wisconsin: "(1) the gravity of the underlying offense, and (2) whether the government can demonstrate an 'immediate or continuous' pursuit of the suspect from the scene of the crime."  United States v. Anderson, 688 F.3d 339, 344 (8th Cir. 2012) citing Welsh, 466 U.S. 740, 753 (1984).  The defendant argues that the officers were not in "immediate or continuous" pursuit of him to justify their entry into his camper.  Specifically, the defendant argues that unlike in Schmidt, the incident the officers were investigating occurred ten hours before they arrived at the defendant's residence.  Also distinguishable from the instant case, both Schmidt and Santana involved the pursuit of the defendant immediately following an offense being committed—law enforcement were physically and temporally proximate to the offense for which the defendants were arrested.  It is arguable that the deputies here were in 'continuous' pursuit of the defendant because the investigation was uninterrupted once the incident was reported by Wright, although not from the scene of the crime.  However, having concluded that Sgt. Foley had a legitimate concern for his own safety, it is not necessary to resolve the question of whether 'hot pursuit' was also present in this case.

---

[2] In Sgt. Foley's affidavit in support of the search warrant obtained for the defendant's residence, he describes the defendant's residence as "a camper shell, approximately 8' x 8' long".  (Gov. Ex. 8).

10

Here, testimony by both arresting deputies placed the defendant firmly at his doorway at the time Sgt. Foley attempted to arrest the defendant for the serious crime of unlawful use of a weapon.[3] To effect the arrest, Sgt. Foley took hold of the defendant's arm and ordered him to step outside of his camper; in response to this command, the defendant then retreated inside his camper. As in Santana, such retreat from the public place of his doorway into his private camper cannot thwart the officer's lawful arrest under Watson. Where law enforcement attempt to make an arrest for a serious offense in a public place, the Fourth Amendment does not require that they have a warrant before pursuing the suspect into a private home. Santana, 427 U.S. at 42-43; see also Schmidt, 403 F.3d at 1013-15. Consequently, the Court finds that the officers' warrantless entry into the defendant's camper to affect his arrest based on probable cause was justified by the exigency of the law enforcement officers' legitimate concern for their own safety.

### B. Search of the defendant's camper

The Court finds the defendant's argument that the search of his camper was unreasonable to be unpersuasive. The shotgun recovered from the defendant's camper was seized pursuant to a valid search warrant.[4] Further, the shotgun could have been seized without a warrant under the plain view doctrine. "Under the plain view doctrine, police may seize an object without a warrant if '(1) the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed, (2) the object's incriminating character is immediately apparent, and (3) the officer has a lawful right of access to the object itself.'" United States v. Collins, 321 F.3d 691, 694 (8th Cir. 2003) quoting United States v. Hatten, 68 F.3d 257, 260 (8th Cir. 1995).

---

[3] At the hearing, the exact positioning of the defendant with respect to the doorway and at what point in relation to the defendant's retreat that any part of either deputy crossed the doorway was disputed. However, the critical factual findings include that the deputies were lawfully on the defendant's property, that the defendant voluntarily came to his doorway, that at his doorway the defendant was exposed to the public, that Sgt. Foley attempted to effect the defendant's arrest while he was in the doorway, and that the defendant resisted arrest and retreated into his camper. United States v. Santana, 427 U.S. 38, 43, 96 S. Ct. 2406, 49 L. Ed. 2d 300 (1976).

[4] As an extension of the defendant's argument that neither the arrest nor Dep. Blehm's observations of the shotgun was lawful, the Court rejects the defendant's contention that the search warrant was invalid for the same reasons. The deputies' entry into the camper was lawful to effect the defendant's arrest, and the information obtained by Sgt. Foley and Dep. Blehm could properly be used in support of the search warrant obtained by Sgt. Foley for the defendant's camper.

11

As discussed above, the deputies' actions in entering the defendant's camper to effect his arrest was lawful. In doing so, Sgt. Foley tore the blanket down that would have otherwise have obstructed the view into the camper's interior because of his legitimate concern that the defendant had immediate access to a shotgun. The deputies pulled the defendant out of the camper and placed him in handcuffs. Dep. Blehm testified that he then stood up and turned to look into the camper. At this time, Dep. Blehm observed the handle of a shotgun with black tape, matching the description provided by Miller and Wright, located in the sleeping area of the camper. Therefore, the shotgun was in plain view of Dep. Blehm when he stood up after securing the defendant just outside the camper, a place he had a right to be. See Wash v. Chrisman, 455 U.S. 1, 5-6 (1982) ("The 'plain view' exception to the Fourth Amendment warrant requirement permits a law enforcement officer to seize what clearly is incriminating evidence or contraband when it is discovered in a place where the officer has a right to be." (citing Coolidge v. New Hampshire, 403 U.S. 443 (1971)).

Assuming arguendo that Dep. Blehm's reentry to obtain clothes was illegal upon a finding that the defendant's acquiescence to the reentry was not voluntary, the subsequent search warrant was still valid because the affidavit was based on information obtained by the deputies prior to Dep. Blehm's reentry. In addition, the shotgun handle was clearly visible to Dep. Blehm and could have been lawfully seized without a warrant under the plain view doctrine. See Segura v. United States, 468 U.S. 796 (1984) (holding that the exclusionary rule did not apply where law enforcement learned of the evidence from an independent source so that evidence from an illegal entry that was also obtained pursuant to a valid search warrant was not required to be suppressed). As a result, the observations made by Dep. Blehm both outside and later inside the camper did not taint the subsequent search warrant affidavit. The defendant here was not subject to an unreasonable search or seizure and as such, the Court finds that defendant's contentions are without merit and should be denied.

### III. Conclusion

For the reasons set forth above, this Court finds that the evidence obtained from the arrest and subsequent search of the camper is admissible. Police officers effected a valid arrest based on probable cause and the presence of exigent circumstances justified their entry into the defendant's camper pursuant to Santana. The search that followed was supported by a valid

search warrant. The evidence yielded from execution of the search warrant was not in violation of the defendant's constitutional rights under the Fourth Amendment.

IT IS THEREFORE RECOMMENDED that the motion of defendant William Council for suppression of evidence (doc. 21) be DENIED.

Counsel are reminded that they have fourteen days from the date of receipt of a copy of this Report and Recommendation within which to file and serve objections. A failure to file and serve exceptions by this date shall bar an attack on appeal of the factual findings in the Report and Recommendation which are accepted or adopted by the district judge, except on the grounds of plain error or manifest injustice.

Dated this 20th day of March, 2015, at Jefferson City, Missouri.

/s/ *Matt J. Whitworth*
MATT J. WHITWORTH
United States Magistrate Judge